IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN DEPAULA,

     **Plaintiff,**

v.                                     **No. 1:14-cv-00252-MCA-SCY**

EASTER SEALS, EL MIRADOR,
a corporation,

     **Defendant.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** is before the Court on *Defendant Easter Seals El Mirador's Motion for Summary Judgment on Plaintiff's Claims for Violations of Title VII, ADEA, ADA, FMLA, and the New Mexico Human Rights Act*.  [Doc. 96]  The Court has considered the parties' submissions, the relevant law, the record, and has otherwise been fully advised in the premises.

**BACKGROUND**

Defendant Easter Seals El Mirador (ESEM) is a not-for-profit New Mexico corporation that provides services and facilities for adult developmentally disabled persons so that they may live lives of meaning and dignity.  [Doc. 96 p. 1-2]  Plaintiff worked for ESEM for twenty-two years, from August 1990 until June 2012.  [Doc. 110 p. 1]  In 1994 Plaintiff was promoted to the position of Deputy Director of Program Operations.  [Doc. 96 p. 2]  In this position, Plaintiff oversaw several aspects of ESEM's

1

operation.  [Doc. 96 p. 2]  For twenty-one of his twenty-two year employment with

ESEM, Mark Johnson, ESEM's CEO, was Plaintiff's direct supervisor.  [Doc. 110 p. 1]

In January 2012, Mr. Johnson hired Patsy Romero as ESEM's Chief Operating

Officer.  [Doc. 96 p. 2]  Ms. Romero was hired, in part, to implement measures to

accomplish significant cost containment.  [Doc. 96 p. 2; Doc. 96-5 p. 5]  When she was

hired, Ms. Romero became Plaintiff's direct supervisor.  [Doc. 110 p. 1]

Another ESEM employee, Ken Quintana, assumed the position of Incident

Manager in 2011.  [Doc. 96 p. 2]  In that role, Mr. Quintana was responsible for

providing investigation reports to the Department of Health following reports of abuse,

neglect, or exploitation.  [Doc. 96 p. 2]  Plaintiff supervised Mr. Quintana until December

2011, and then, when Ms. Romero became COO, she became Mr. Quintana's supervisor.

[Doc. 96 p. 3]  Mr. Quintana was diagnosed with cancer in the summer of 2011, while

Plaintiff was still his supervisor.  [Doc. 96 p. 3]

In March 2012, Ms. Romero moved Plaintiff from his position as Deputy Director

of Program Operations into a Risk Manager/Incident Manager/Director of Risk

Management position.  [Doc. 110 p. 2]  Shortly thereafter, also in March 2012, Plaintiff

requested, and was granted, FMLA leave to care for his mother, who had been diagnosed

with dementia.  [Doc. 96 p. 3; Doc. 110 p. 2]  Plaintiff understood that his FMLA leave

began on March 30, 2012 and ended on June 29, 2012.  [Doc. 110 p. 2]

On June 25, 2012 Ms. Romero terminated Plaintiff's employment via letter.  [Doc.

110 p. 2]  In the letter, Ms. Romero indicated that Plaintiff's employment was being

terminated because his position was being eliminated for budgetary reasons.  [Doc. 96 p.

3; Doc. 96-7 p. 1]  The letter also referred to issues with Plaintiff's performance over the four proceeding years, and Mr. Johnson's dissatisfaction with Plaintiff's performance, as an alternative reason for the decision to terminate his employment.  [Id.]

As a result of his termination, Plaintiff filed a thirteen-count *Complaint* against Defendant, claiming: Gender Discrimination in violation of The New Mexico Human Rights Act (NMHRA), NMSA 1978, § 28-1-1 *et seq.* and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (Counts 1 and 2, respectively); Age Discrimination in violation of the NMHRA and the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. § 621 *et seq.* (Counts 3 and 4, respectively); Discrimination Based on Association with a Person with a Disability/Serious Medical Condition in violation of the NMHRA and the Equal Opportunity for Individuals with Disabilities Act (ADA), 42 U.S.C. § 12112 (Counts 5 and 6, respectively); Retaliation in violation of the NMHRA (Count 7); Wrongful/Retaliatory Discharge (Count 8); Breach of Covenant of Good Faith and Fair Dealing (Count 9); Negligent Retention and Supervision (Count 10); Intentional Interference with Business Relations (Count 11); Prima Facie Tort (in the alternative) (Count 12); and Interference and Retaliation in violation of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* (Count 13). **[Doc. 21]**  Defendant seeks summary judgment as to each of Plaintiff's claims.  **[Doc. 96]**

Additional facts are provided in the context of the Court's analysis of the issues raised in Defendant's Motion for Summary Judgment, Plaintiff's Response, and Defendant's Reply.  [Doc. 96; Doc. 110, Doc. 117]

**ANALYSIS**

**I. Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); *see* Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). Once the movant demonstrates that no genuine issue of material fact exists, the nonmovant is given "wide berth" to demonstrate a factual controversy. *Id.* "Unsupported conclusory allegations, however, do not create an issue of fact." *Id.*

**II.  Plaintiff's Gender Discrimination Claims**

Both the NMHRA and Title VII prohibit an employer from discharging or demoting an employee, or discriminating against an employee in matters of compensation, terms, conditions or privileges of employment, because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1); NMSA 1978, § 28-1-7(A). To prevail in a sex discrimination claim under either of these statutes, Plaintiff must establish intentional discrimination using the "*McDonnell Douglas*" burden-shifting analysis. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1148-49 (10th Cir. 2005) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under the *McDonnell Douglas* analysis, the plaintiff bears the initial burden of

making a prima facie showing of discrimination by demonstrating:  "(1) membership in a

protected class, (2) adverse employment action, and (3) disparate treatment among

similarly situated employees."  *Orr*, 417 F.3d  at 1149.  If the plaintiff succeeds in

meeting his initial burden, "the burden shifts to the defendant to demonstrate a legitimate

non-discriminatory reason for the adverse employment action."  *Id.*  Then, assuming that

the defendant meets its burden, "the burden shifts back to the plaintiff to demonstrate that

the defendant's proffered reason is pretext[ual]."  *Id.*

The validity of the *McDonnell Douglas* analysis, particularly the plaintiff's low

burden at the prima-facie-showing stage, rests upon the principle that an employer's

"invidious intent" may be presumed to arise because the plaintiff is a member of a

historically disfavored group.  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d

1136, 1149 (10th Cir. 2008).  "When [the] plaintiff is a member of a historically *favored*

group," however, "an inference of invidious intent is warranted only when background

circumstances support the suspicion that the defendant is that unusual employer who

discriminates against the majority." *Id.* (Emphasis added).  Thus, in circumstances such

as those here—Plaintiff is a man, and men are a historically favored group—the

*McDonnell Douglas* analysis is modified to require the plaintiff to demonstrate that

"background circumstances support the suspicion that the defendant is that unusual

employer who discriminates against the majority."  *Adamson*, 514 F.3d at 1149-50.

As an initial matter, the Court notes that during the twenty-one years that Plaintiff

worked for ESEM, the company had a male CEO, Mark Johnson.  [Doc. 96-1, p. 1; Doc.

110-2, p. 1 ¶ 2]  In deposition, Plaintiff testified that the evidence supporting the claim that his "termination was motivated by gender discrimination" was that, when his employment was terminated, "there were five men . . . eliminated from the organization" by Ms. Romero.  [Doc. 96-5 p. 4]  Plaintiff also testified, however, that Ms. Romero "discriminated against women as well" and he named four female employees of ESEM who were "targeted" by Ms. Romero.  [Doc. 96-5 p. 6]  Further, a list of employees terminated from ESEM's employ in the years 2011-2012 reflect that while both men and women were terminated, the number of female terminated employees exceeded the number of terminated male employees.  [Doc. 96, p. 7 ¶ 27; Doc. 96-9 p. 1-2]  These undisputed material background facts contravene, rather than support a suspicion that ESEM discriminated against men.

In response to Defendant's argument that summary judgment is warranted on the ground that the undisputed material facts do not support a suspicion that ESEM discriminated against men, and therefore Plaintiff cannot make a prima facie showing of gender discrimination, Plaintiff merely states that he "has presented an abundance of evidence . . . regarding discrimination in order to survive summary judgment." [Doc. 96 p. 17-19; Doc. 110 p. 24]  Plaintiff's bare assertion that an "abundance of evidence" supports his sex-discrimination theory is unpersuasive viewed against the backdrop of the undisputed evidence, discussed above, that tends to preclude rather than support, a suspicion that ESEM was the "unusual employer who discriminates against the majority". The Court concludes that Plaintiff has failed to make a prima facie showing of sex-

discrimination. As such, summary judgment in favor of Defendant is warranted as to Counts 1 and 2 of Plaintiff's *Complaint*.

### III. Plaintiff's Age Discrimination Claims

The ADEA and the NMHRA prohibit an employer from discharging or demoting an employee, or discriminating against an employee in matters of compensation, terms, conditions or privileges of employment, because of the employee's age. 29 U.S.C. § 623(a); NMSA 1978, § 28-1-7(A). In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 173, 177-78 (2009), our Supreme Court held that a plaintiff claiming age discrimination under the ADEA is required to prove, by a preponderance of the evidence, that age was the "but-for" cause of the employer's at-issue decision; the burden of persuasion never shifts to the employer. While the burden of persuasion rests entirely with the plaintiff to show that the defendant discriminated against him because of his age, the Court continues to rely upon the *McDonnell-Douglas* analysis to evaluate the plaintiff's claim[1] which shifts the burden of *production* from the plaintiff to the defendant, and back to the plaintiff. *Jones v. Oklahoma City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010). This analysis applies, as well, to Plaintiff's NMHRA claim. *Cates v. Regents of N.M. Inst. of Mining & Tech.*, 1998-NMSC-002, ¶ 16, 954 P.2d 65

---

[1] While the *Gross* Court expressly avoided determining whether, in light of its holding, the *McDonnell-Douglas* analysis would still be used to analyze ADEA claims, our Tenth Circuit has held that the *McDonnell Douglas* analysis continues to apply to ADEA claims. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010) ("Although we recognize that *Gross* created some uncertainty regarding the burden-shifting in the ADEA context, we conclude that it does not preclude our continued application of McDonnell Douglas to ADEA claims.").

(stating that New Mexico Appellate Courts rely on the *McDonnell Douglas* analysis in evaluating NMHRA claims); *Slusser v. Vantage Builders, Inc.*, 2013-NMCA-073, ¶ 25, 306 P.3d 524 (declining to address whether "the new and harsher standards of proof" implemented in *Gross* modify the analysis used by New Mexico appellate courts to evaluate NMHRA claims).

Here, the Court must first consider whether Plaintiff has demonstrated a prima facie case of age discrimination. "To prove a prima facie case of age discrimination, a plaintiff must show" that he (1) "is a member of the class of people protected by the ADEA;" (2) "suffered an adverse employment action;" (3) "was qualified for the position at issue;" and (4) "was treated less favorably than others not in the protected class." *Jones*, 617 F.3d at 1279 (alteration omitted). The first two elements of the prima facie case are not at issue. Defendant concedes that Plaintiff, who is over forty-years old, is a member of the class protected by the ADEA and that Plaintiff's termination from employment constituted an adverse employment action. *See* 29 U.S.C § 631(a) (limiting the applicability of the ADEA "to individuals who are at least 40 years of age"); *Cates*, 1998-NMSC-002, ¶ 18 (holding that "40 years old marks the minimum age in the protected age class in cases of . . . employment discrimination" under the NMHRA). [Doc. 96 p. 21]

Defendant does not concede that Plaintiff has satisfied the remaining two elements of his prima facie case; however, viewing the evidence in the light most favorable to Plaintiff, the Court concludes Defendant has satisfied his initial burden. *See Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1007 (10th Cir. 2002) (stating that, in the context of

summary judgment, the Court is "required to draw all reasonable inferences in the light most favorable to [the] nonmovant").  In a deposition, Ms. Romero testified that she chose Plaintiff for the position of risk management director because he was "a credentialed clinical director[.]"  [Doc. 110-4 p. 3]  From this fact, a reasonable jury could find that Plaintiff was qualified for the position from which he was terminated.  *See Nguyen v. Gambro BCT, Inc*., 242 Fed.Appx 483, 488 (10th Cir. 2007) ("A plaintiff may make out a pirma facie case of discrimination in a discharge case by credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was hired[.]" (alteration omitted).  Additionally, based upon the fact that Ms. Wadley, age thirty-six, was hired to perform the incident management duties, a reasonable jury could conclude that Plaintiff was replaced by a younger person.  [Doc. 110-5 p. 6; Doc. 110-3 p. 7]  *See Jones v. Unisys Corp*., 54 F.3d 624, 630 (10th Cir. 1995) (stating that evidence that the plaintiff in an age discrimination case was replaced by a younger person is an alternative way of satisfying the treated-less-favorably-than-younger employees element).

Since Plaintiff satisfied his initial burden, the Court next considers whether Defendant has produced evidence of "a legitimate nondiscriminatory reason for [its] decision" to terminate Plaintiff's employment.  *Id.*  Defendant's proffered non-discriminatory reasons for its decision to terminate Plaintiff's employment fall into two categories:  Defendant's financial difficulty/downsizing, and Mark Johnson's (ESEM's CEO) documented history of dissatisfaction with Defendant's work-place conduct. Although Defendant's primary reason for terminating Plaintiff's employment was its decision to eliminate Plaintiff's position, the termination letter also referenced "past

instances of problems with [Plaintiff's] performance" as a contributing factor in its decision.  [Doc. 96-7 p. 1-2]

As to Defendant's financial difficulty/downsizing, Ms. Romero testified in a deposition that the finances at ESEM were such that the agency had to be restructured—several positions were eliminated altogether, and the duties formerly associated with multiple "standalone" positions were incorporated into newly described jobs that would be performed by a single employee.  [Doc. 96 p. 22; Doc. 96-4 p. 2, 5-6, 8-9]  Plaintiff's own deposition testimony, in which he said that ESEM "was having major cash flow issues" that led to "all kinds of issues" including that utilities were turned off,  supports Ms. Romero's account of ESEM's financial difficulty.  [Doc. 96-5 p. 18] And further evidence of ESEM's financial difficulty comes from Mike Easley, ESEM's accountant and chief financial officer, who stated in an affidavit that "there was an ever[]-increasing cash flow issue[] for ESEM"; that in 2011, "ESEM was having trouble paying its regularly occurring bills"; and that by December 31, 2011, six months into the fiscal year, ESEM had incurred one million dollars in net loss.  [Doc. 96-16 p. 1-2 ¶¶ 3-4, 8]

Additionally, several letters written throughout 2009-10 by Mr. Johnson to Plaintiff indicate that Plaintiff's refusal to follow Mr. Johnson's direction was damaging to the organization—both financially, and in terms of employee morale and cooperation; and that Mr. Johnson was concerned that Plaintiff's conduct was placing ESEM a risk of being sued.  [Doc. 96-1 p. 1-11]  For example, Mr. Johnson wrote to Plaintiff on July 16, 2009, about "some . . . problems that need to be addressed (as generally speaking) give a sense of heightened concern to the overall health of Program and Clinical operations."

[Doc. 96-1, p. 1]  The letter addressed recent monetary sanctions assessed against ESEM related to quality improvement—an aspect of ESEM's operation within the purview of Plaintiff's supervision.  [Id.]  The letter emphasized that ESEM "CANNOT afford to continue to operate with an inadequate system for quality improvement" and stated that "[a]ll parties and staff must work together and understand their roles and responsibilities" in that regard.  [Id.]  Mr. Johnson also advised Plaintiff that "the working relationship of ALL Program Directors" including him, needed to be "immediately remediated"; and that Mr. Johnson was "becoming increasingly concerned about [Plaintiff's] relationship and attitude with" one of the employees under his supervision.  [Id. p. 2-3]  Mr. Johnson further stated, in regard to a directive that Plaintiff had contravened, that "any future dismissal of a directive from me will not be tolerated."  [Id. p. 3]

Another letter followed approximately two weeks later.  This letter addressed many of the same concerns as the earlier letter; it also expressed new concerns regarding Plaintiff's professional judgment related to a troubled client—Mr. Johnson stated that he was concerned about Plaintiff's well-being because his "decision making process" appeared to be "clouded."  [Doc. 96-1 p. 4-5]  The letter also addressed Plaintiff's continuing, and escalating, hostility toward one of the employees under his supervision. For example, in regard to that employee, Mr. Johnson wrote:

> I have . . . spent many hours listening to you and offering you support and advice.  [An H.R. person] and I have repeatedly counseled you about retaliation and a hostile work environment, not only to protect the organization but also out of concern for your personal liability should a lawsuit ever be filed. . . . I advised you to park your anger and emotions and treat [the employee] with professionalism and respect. . . . I cannot continue to work with a negative, distrustful attitude. . . . I can only conclude that

> you have decided to continue to use your negative feelings specific to these issues with [the employee] which has spilled over into the bigger spectrum of your employment.  It doesn't sound like you want to be here, so you need to tell me how you wish to proceed, as this behavior is impeding upon your ability to be successful.

[Id. p. 6-7]  Two subsequent letters repeated these themes, and noted additional performance issues (by Plaintiff and others) that threatened the viability of ESEM.  [Id. p. 8-12]  In addition, ESEM was fined $8,000 as a result of Plaintiff having "forgotten" to send a required report to a state agency.  [Doc. 96-5 p. 15]

Based on the foregoing, the Court concludes that Defendant has satisfied its burden of producing evidence that its decision to terminate Plaintiff's employment was supported by legitimate, non-discriminatory reasons.  *See Jones*, 54 F.3d at 631 (recognizing that a reduction in force necessitated by an employer's financial hardship constitutes a legitimate, non-discriminatory reason for terminating a person's employment);  *Brown v. Parker Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984) (recognizing that insubordination is a legitimate non-discriminatory reason for discharging an employee).  Accordingly, the burden of presentation shifts to Plaintiff who is required to demonstrate that a reasonable jury could conclude that but-for his age, Defendant would not have terminated his employment.  *Tatom v. Res-Care, Inc.*, 601 Fed.Appx. 696, 701 (10th Cir. 2015) (stating that, in the context of an age discrimination claim, once the employer demonstrates a legitimate, non-discriminatory reason for its at-issue decision, the burden of production shifts back to the plaintiff to demonstrate that the proffered decision was a pretext for age discrimination).

"In order to demonstrate pretext, Plaintiff is required to "produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable fact[-]finder could rationally find them unworthy of credence and hence infer that [Defendant] did not act for the asserted non-discriminatory reasons." *Id.* Plaintiff attempts to demonstrate pretext by showing that a disputed issue of fact exists as to whether Defendant was experiencing financial difficulty and was downsizing.  [Doc. 110 p. 28]  In support of this claim, Plaintiff points to minutes from a senior management meeting held in January 2012, at which Mr. Johnson announced that "the Foundation provided a check for $150,000 to help cash flow[.]"  [Id; Doc. 110-5 p. 1]  He also points to minutes from another senior management meeting, held in April 2012 in which Mr. Johnson announced that ESEM was breaking even, and that the following year was a "rebase year" in which ESEM would raise its rates.  [Doc. 110-5 p. 2]  And finally, he points to the fact that the minutes from a June meeting (presumably held in 2012) that Ms. Wadley was being "hired to cover Incident Management."  [Doc. 110-5 p. 6]  These facts do not demonstrate that Defendant's proffered reasons for terminating Plaintiff's employment were so weak, implausible, inconsistent, or contradictory that a reasonable fact-finder would find them unworthy of belief.

The "Foundation" to which Mr. Johnson referred in the January 2012 meeting is the Foundation of the Knights Templar.  [Doc. 117-5 p. 4]  The mission of the foundation, at least in part, is to fund or support ESEM.  [Id.]  The complexities of the relationship between the Foundation and ESEM are not relevant here except to the extent

that the undisputed facts show that the Foundation has never contributed to ESEM employees' salaries; and, in terms of financial support, the Foundation had made a single financial contribution—that referenced in the January 2012 senior management meeting minutes—to help ESEM with cash flow during what Mr. Johnson described as "a very tough time."  [Doc. 117-5 p. 3-4]  That ESEM was assisted by the Foundation when it was experiencing cash flow problems supports the evidence of Defendant's financial hardship during the relevant time frame.  The fact that ESEM was "breaking even" in April 2012, having received financial assistance from the Foundation, and in the midst of its restructuring, and the fact that it would raise its rates the following year also do not render Defendant's financial hardship/restructuring reasons implausible or unworthy of credence.  To the contrary, these facts viewed in context, demonstrate that ESEM's response to its financial issues allowed the organization to satisfy its financial obligations, and that it had a plan to increase its income in the future.  None of these facts support an inference that but-for the fact that Plaintiff was over forty years old, ESEM would have continued to employ him.

Further, the fact that Ms. Wadley was hired to "cover" incident management does not create a triable issue of fact as to whether ESEM used the "elimination" of Plaintiff's position as a pretext to terminate him because of his age.  *See Hare v. Denver Merch. Mart, Inc.*, 255 Fed.Appx. 298, 302 (10th Cir. 2007) (stating that, in the context of an age-discrimination claim, "[t]he test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position" (alteration omitted)).  The incident manager

position formerly held by Plaintiff was, indisputably, eliminated.  [Doc. 110-5 p. 4]  Ms. Wadley, who was hired as the quality improvement (QI) coordinator, was expected to perform the duties associated with the QI position and those formerly associated with the incident manager position.  [Id.; Doc. 96 p. 6 (¶ 15)]  This was one of several instances in which ESEM eliminated stand-alone positions and incorporated the duties formerly associated with such positions into newly described jobs that would be performed by a single employee.  *See id.* (stating that, as a matter of law, a position is eliminated when the responsibilities associated with the single position are reassigned to a number of individuals).  [Doc. 96 p. 6 (¶ 15), 22; Doc. 96-4 p. 2, 5-6, 8-9]

Even assuming that the incident management duties assigned to Ms. Wadley create a triable issue of fact as to whether she was hired as Plaintiff's replacement, Plaintiff does not demonstrate that ESEM replaced him *because* of his age.  That Mr. Johnson had expressed continuing and increasing dissatisfaction with Plaintiff's conduct constitutes a legitimate, independent, reason that Defendant terminated Plaintiff's employment.  Plaintiff does not argue that this reason is unworthy of belief.

For the foregoing reasons, Plaintiff has not demonstrated that Defendant's proffered reasons for terminating his employment were a pretext for age discrimination. Accordingly, summary judgment in favor of Defendants as to Counts 3 and 4 is warranted.

### IV. Plaintiff's Association with a Person with a Disability/Serious Medical Condition Claims

The NMHRA and the ADA prohibit an employer from discriminating an employee based upon his association with a person with a disability or serious medical condition.  42 U.S.C. § 12112(b)(4) (prohibiting an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association"); Doc. 49 p. 15 (concluding that the NMHRA prohibits association discrimination).  Plaintiff claims that his association with his co-worker Mr. Quintana, who had cancer; and Plaintiff's association with his mother, who suffered from dementia, led Defendant to terminate his employment.  [Doc. 110 p. 11-12 ¶ 28)]

The Court evaluates association-discrimination claims using a modified version of the *McDonnell Douglas* analysis.  *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997).  To establish a prima facie case of association discrimination, the plaintiff is required to demonstrate that he: (1) "was qualified for the job at the time of the adverse employment action"; (2) "was subjected to adverse employment action"; (3) "was known by his employer at the time to have a relative or associate with a disability"; and, (4) that "the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision."  *Id.*  If the plaintiff makes this prima facie showing, "then the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action*." Id.*  "Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual." *Id.*

16

Defendant concedes that Plaintiff has satisfied the first three elements required to establish a prima facie case of association discrimination. [Doc. 96 p. 24]   Accordingly, the Court does not address those elements. In regard to the fourth element of Plaintiff's prima facie case, Defendant argues that Plaintiff cannot demonstrate that his employment was terminated under circumstances that raise a reasonable inference that Plaintiff's association with his mother, or with Mr. Quintana, was a determining factor in Defendant's decision. [Id.] Defendant's argument in that regard rests primarily upon Plaintiff's own deposition testimony. [Doc. 96 p. 24-25]

In his deposition, Plaintiff testified that he believed he was discriminated against for his association with Mr. Quintana because (1) Ms. Romero told Plaintiff that she did not want him to help Mr. Quintana perform his job; (2) notwithstanding Ms. Romero's instruction in that regard, Plaintiff continued to help Mr. Quintana until December 14th or 15th, 2011, by reviewing and editing Mr. Quintana's reports to make them clearer and (3) as a result, his salary was reduced[2] and, eventually, he was terminated. [Doc. 96 p. 24; Doc 96-5 p. 8-10] Defendant contends that, because Plaintiff was terminated at least six months after he ceased helping Mr. Quintana, Plaintiff's termination the events are too attenuated to support an inference that Plaintiff's it terminated Plaintiff's employment because he helped Mr. Quintana. The Court agrees. *See Haynes v. Level 3 Comm'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding that the passage of seven months

---

[2]The undisputed facts show that Plaintiff sustained a one-time $7500 decrease in his salary to compensate for the assessment of an $8000 penalty to ESEM caused by Plaintiff having "forgotten" to send a compliance report to a state agency. [Doc. 96-5 p. 15; Doc. 96-4 p. 4]

between the protected activity and the alleged retaliation was too long to support an inference of discrimination), *abrogated on other grounds by Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (applying the same principle to the passage of three months); *contra Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (stating that an inference of discrimination is appropriate where approximately one or two months has passed between the protected activity and the alleged discriminatory action).

Defendant argues that Plaintiff's claim of association discrimination, in regard to his mother, is premised on Plaintiff's unsubstantiated observation of Ms. Romero "harassing  or firing" four other employees after they took leave to deal with their own or a family member's health issues.  [Doc. 96-5 p. 7-8]   The instances of harassment, as described by Plaintiff were: (1) Ken Quintana was "harassed unmercifully"; (2) there were "complications around [another employee] leaving the organization" after she took leave; (3) yet another employee's assistant was "taken from her" when she returned from leave, which made her job "impossible" and "she ended up having to leave"; and (4) another's employee's "life was made miserable" so eventually he had to leave.  [Doc. 96-5 p. 7]  Defendant argues that Plaintiff's subjective belief,  reflected in these statements, that he and other employees were subjected to adverse employment action because of their own, or a family member's, disability is insufficient to satisfy his initial burden. [Doc. 96 p. 25-26]

Plaintiff's only response to the foregoing is that he "sets forth genuine factual disputes in his Responses [to Defendant's undisputed material facts] and his Affidavit."

[Doc. 110 p. 25]  Aside from this unadorned, conclusory statement, Plaintiff makes no argument, nor does he point to any specific evidence, to show that he can establish a prima facie case of association discrimination.  As such, the Court is not persuaded that Plaintiff has satisfied his initial burden.

Even assuming that Plaintiff could satisfy his initial burden, however, Defendant produced legitimate reasons for terminating Plaintiff's employment.  Those reasons, discussed earlier will not be repeated here.  Plaintiff has failed to demonstrate pretext. Accordingly, even were the Court to assume that Plaintiff could satisfy his initial burden, Plaintiff's association-discrimination claim fails as a matter of law on that ground.  For these reasons, the Court concludes that summary judgment in favor of Defendants as to Counts 5 and 6 of Plaintiff's complaint is appropriate.

### V.  Plaintiff's NMHRA Retaliation Claim

In Count 7 of his *Complaint* Plaintiff alleges that Defendant retaliated against him for engaging in a number of protected activities, specifically because he: (1) reported discrimination, retaliation, harassment, and a hostile work environment; and (2) requested benefits and accommodations for employees with serious medical conditions.[3] [Doc. 21 p. 19-20]  Plaintiff's remaining claims of retaliation under the NMHRA are premised on the theory that Defendant retaliated against him for supporting, and opposing Defendant's unfair treatment of Mr. Quintana. [Doc. 21 ¶¶ 4, 44, 46]

---

[3] Plaintiff also claims that, contrary to the NMHRA, Defendant unlawfully discriminated against him for having requested, and taken, family medical leave.  [Doc. 21 p. 19-20] Defendant argues that the NMHRA does not provide a cause of action for FMLA retaliation.  [Doc. 96 p. 12]  The Court addresses this argument, and the substance of Plaintiff's FMLA retaliation claim, in its discussion of Count 13.

"The NMHRA makes it unlawful for any person or employer to retaliate against any person who has opposed any unlawful discriminatory practice." *Charles v. Regents of N.M. State Univ.*, 2011-NMCA-057, ¶ 13, 256 P.3d 29. "Retaliation can include threats, reprisals, or discrimination." *Id.* "In order to establish a claim of retaliation under the NMHRA, a plaintiff must demonstrate that (1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between these two events." *Id.* ¶ 8.

Defendant argues that there is no evidence that Plaintiff complained of, or otherwise reported, that Mr. Quintana was subjected to discrimination, retaliation, harassment, and a hostile work environment. [Doc. 96 p. 16] Plaintiff does not refute this argument. Defendant argues, further, that Plaintiff's persistence in helping Mr. Quintana with his work, which as discussed above Plaintiff ceased doing six months before his employment was terminated, comprised the extent of Plaintiff's "request" that Defendant accommodate Mr. Quintana. [Doc. 96 p. 16; see Doc. 96-5 p. 8] Plaintiff does not refute this argument. On these grounds, Defendant argues that Plaintiff cannot establish retaliation under the NMHRA. The Court agrees with Defendant.

New Mexico appellate courts have yet to expressly determine whether to adopt our Tenth Circuit precedent regarding temporal proximity between a protected activity and an alleged discriminatory action. *See Juneau v. Intel Corp.*, 2006-NMSC-002, ¶¶ 20-22, 127 P.3d 548 (discussing, but declining to apply a temporal proximity analysis or adopt a specific time period for inferring facts related to causation in the context of the NMHRA). Nevertheless, in the present case, where the only evidence of retaliation is

that Plaintiff's employment was terminated six months after he sought to "accommodate" Mr. Quintana by helping him with his work, the Court concludes that it is not reasonable to infer that Plaintiff was terminated in retaliation therefor. *See e.g., Richmond, Inc.*, 120 F.3d at 209 (stating that the passage of three months between a protected activity and an alleged discriminatory act does not support an inference of causality). Because Plaintiff has failed to demonstrate a causal-connection between the termination of his employment and his engagement in a protected activity, the Court concludes that summary judgment is warranted as to Count 7. The Court's conclusion in this regard is further supported by Defendant's presentation of legitimate reasons for terminating Plaintiff's employment, and Plaintiff's failure to demonstrate that those reasons are pretextual. *See Juneau*, 2006-NMSC-002, ¶ 23 (explaining that a retaliation claim brought under the NMHRA is analyzed using the *McDonnell Douglas* burden-shifting analysis).

## VI.  Plaintiff's Wrongful/Retaliatory Discharge Claim

In Count 8 of his *Complaint*, Plaintiff claims that in terminating his employment, Defendant committed the tort of "wrongful/retaliatory discharge," which is a cause of action recognized by New Mexico courts. [Doc. 21 ¶¶ 131-35] *Ruby v. Sandia Corp.*, 699 F.Supp.2d 1247, 1267 (D.N.M. 2010). "New Mexico courts created the tort of wrongful discharge as a means of redress for the very limited situation in which an employee has no other means of protection against an employer's breach of public policy." *Id.* "If the employee already has some protection, either because of an employment contract or through another cause of action . . . the tort will not be

recognized." *Id.* (citing cases from this jurisdiction in which wrongful discharge claims have been denied on the ground that the claims could be raised pursuant to Title VII).

Here, Plaintiff's wrongful/retaliatory discharge claim is premised on the theory that he was wrongfully/retaliatorily discharged because he took FMLA leave to care for his mother.  [Doc. 121 ¶ 132]  The same theory comprises Count 13, which is Plaintiff's claim of FMLA interference/retaliation.  [Doc. 21 ¶¶ 163-70]  Defendant seeks summary judgment on Plaintiff's wrongful/retaliatory discharge claim on the ground that Plaintiff may seek redress for this alleged wrong under the FMLA.  [Doc. 96 p. 11]  The Court concludes that, as a matter of law, Defendant is entitled to judgment in its favor on Plaintiff's wrongful/retaliatory discharge claim on the ground that Plaintiff may, and does, seek to redress this alleged wrong pursuant to the FMLA.  *Ruby*, 699 F.Supp.2d at 1267.

## VII.  Plaintiff's  Claim that Defendant Breached the Covenant of Good Faith and Fair Dealing

In Count 9 of Plaintiff's *Complaint*, he claims that by terminating his employment without "just cause" Defendant breached the covenant of good faith and fair dealing. [Doc. 21 p. 21, ¶ 136]  New Mexico has recognized that the cause of action for a breach of the covenant of good faith and fair dealing sounds in contract.  *Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 16, 872 P.2d 852.  The New Mexico Supreme Court has expressly held that this cause of action is not available to at-will employees. *Melnick v. State Farm Mut. Auto Ins. Co.*, 1988-NMSC-012, ¶ 16, 749 P.2d 1105.

Here, it is undisputed that Plaintiff was an at-will employee of ESEM.  [Doc. 96 p. 5 ¶ 8; Doc. 96-11; see Doc. 110 ¶ 8]  Therefore, Defendant argues, Plaintiff's breach-of-the-covenant-of-good-faith–and-fair-dealing claim fails as a matter of law.  [Doc. 96 p. 26-27]  While he does not dispute the fact that he was employed at-will, Plaintiff argues that in 2009, at an ESEM management retreat, he announced that he intended to work for ESEM until 2023, at which time he would be seventy years old.  [Doc. 110 p. 7]  Plaintiff argues that his announcement gave rise to an implied employment contract between him and ESEM.  [Doc. 110 p. 29]  Plaintiff does not provide any relevant authority to support the notion that his announcement gave rise to an implied employment contract.  Nor does Plaintiff provide any evidence that could, arguably, give rise to the existence of an implied employment contract.  *See Whittington v. State Dept. of Pub. Safety*, 2004-NMCA-124, ¶ 7, 100 P.3d 209 (recognizing that certain documents, such as "employee handbooks, personnel policy guides," and the like may constitute implied employment contracts).  Under these circumstances, the Court concludes, pursuant to *Melnick*, 1988-NMSC-012, ¶ 16, that Plaintiff's claim fails as a matter of law.  Defendant's motion for summary judgment as to this claim is, therefore, warranted.

### VII. Plaintiff's Claim of Negligent Retention and Supervision

In Count 10 of his Complaint Plaintiff claims that ESEM committed the state-law tort of negligent retention and supervision when it hired, and continued to employ, Ms. Romero "in a position where she could discriminate, harass, retaliate, intimidate[,] and harm [him] and other ESEM employees."  [Doc. 21 p. 142-49]  The tort of negligence in hiring or supervising is based on the employer's negligent acts or omissions in hiring or

supervising an employee when the employer knows or should know, through the exercise of reasonable care, that the employee is incompetent or unfit. *Lessard v. Coronado Paint & Decorating Ctr.*, 2007-NMCA-122, ¶ 28, 168 P.3d 155. To prevail in his claim Plaintiff is required to show that: (1) ESEM was his employer; (2) ESEM knew or should have known that hiring and/or supervising Ms. Romero would create an unreasonable risk of injury to Plaintiff and other ESEM employees; (3) ESEM failed to use ordinary care in hiring and supervising Ms. Romero; and (4) ESEM's negligence in hiring and supervising Ms. Romero was a cause of Plaintiff's injury. UJI 13-1647 NMRA; *Jaramillo v. Meteor Monument, L.L.C.*, 2012-NMSC-004, ¶ 34, 275 P.3d 97 (recognizing that the elements of negligent hiring and supervision are set forth in UJI 13-1647). "Ordinary care" is defined in New Mexico jurisprudence as, a "duty assigned to all individuals requiring them to act reasonably under the circumstances according to the standard of conduct imposed upon them by the circumstances." *Tafoya v. Rael*, 2008-NMSC-057, ¶ 14, 193 P.3d 551.

Defendant argues that there is no evidence that ESEM knew or should have known that hiring and/or supervising Ms. Romero would create an unreasonable risk of injury to Plaintiff and other ESEM employees; or that ESEM failed to use ordinary care in hiring and supervising her. [Doc. 96 p. 28-29] In support of these contentions, Defendant points to the following evidence. "ESEM only received one formal complaint against [Ms.] Romero's actions and/or conduct." [Doc. 96-13 p. 2] The complaint was investigated by HR, and HR concluded that there was no "cause for a finding of harassment on the part of Ms. Romero." [Doc. 96-13 p. 2-3] The complainant chose not

to appeal the HR finding.  [Doc. 96-13 p. 3]  Defendant also argues that Plaintiff never "file[d] a report with ESEM concerning Ms. Romero.  Instead, Plaintiff wrote a memorandum concerning Ms. Romero and asked that HR place it in his personnel file[.]" [Doc. 96 p. 28-29]  Defendant argues that Plaintiff's memorandum did not "notify ESEM of any conduct [by] Ms. Romero that was causing harm to employees."  [Doc. 96 p. 29] Defendant argues, further, that Plaintiff's own conduct and ESEM's financial issues— and not its hiring or supervision of Ms. Romero—caused Plaintiff's termination.  [Doc. 96 p. 29]

    In response Plaintiff shows the following.  On March 20, 2012, Plaintiff wrote a "memorandum" addressed to Ms. Romero to "express [his] discontent and disagreement with the, yet another (stet), job reassignment" of which he had had been "briefly informed" a week earlier, and which had been announced at a meeting on March 19. [Doc. 110 p. 30; Doc. 96-10 p. 2]  In this memorandum, Plaintiff states, among other things that, "[i]t is unlikely that this plea will change your mind; you have unbridled power to make decisions with no recourse on my part.  I am frightened to react formally for fear that I will be retaliated against, especially now that I am putting my concerns in writing."  [Doc. 96-10 p. 2]  Plaintiff sent this memorandum to the HR manager with a cover letter stating: "Please place the attached memorandum . . . in my personnel file.  I am concerned that I must be protected with accounts of events that I believe to be unfair." [Doc. 96-10 p. 1]  An e-mailed "statement" from an ESEM employee states that the employee witnessed Ms. Romero tell Plaintiff to stop helping Mr. Quintana perform his job duties, and that if Plaintiff did not "do what he was told[,]" then "consequences

would follow." [Doc. 110 p. 9 (¶ 18), 30; Doc. 110-2] A long-term care program manager who was in a position of regulation-enforcement with ESEM, testified in a deposition that Ms. Romero had, on occasion, "obstructed" her survey; that she had gotten in "fights" with Ms. Romero and with Plaintiff (but that this was "the nature of the job"); and that ESEM's employees were "afraid for their jobs" if the regulatory agency found deficiencies. [Doc. 110 p. 30; Doc. 110-6 p. 1, 4-5]

       As an initial matter, the Court notes that Plaintiff presents no evidence that ESEM knew or should have known that *hiring* Ms. Romero would create an unreasonable risk of injury to Plaintiff or other ESEM employees, or that ESEM failed to use ordinary care in hiring her. In fact, it is undisputed that Plaintiff himself recommended Ms. Romero to be hired in ESEM's training department before she was hired as COO because he thought of Ms. Romero "as someone who could really work well with us[.]" [Doc. 96-5 p. 3]

       Furthermore, Plaintiff's evidence does not support a reasonable inference that ESEM's supervision of Ms. Romero created an unreasonable risk of injury to Plaintiff or other ESEM employees, or that ESEM failed to use ordinary care in supervising her. ESEM responded to its sole employee-complaint regarding Ms. Romero investigating it via HR, and giving the employee an opportunity to appeal its finding of no cause. This fact demonstrates that when it was presented with a complaint regarding Ms. Romero, ESEM acted reasonably under the circumstances by performing an investigation into the complaint. *See Tafoya*, 2008-NMSC-057, ¶ 14 (defining ordinary care as a duty to act reasonably under the circumstances"). To the extent that, by referencing his memorandum, Plaintiff intends to suggest that ESEM was on notice of a second

complaint against Ms. Romero, and that by failing to investigate, or take some supervisory action against Ms. Romero, Defendant breached the duty of ordinary care, the Court is not persuaded.  The evidence shows that Plaintiff gave his memorandum to HR with a cover letter requesting only that the memorandum be placed in his personnel file.  These facts do not give rise to an inference that a duty of ordinary care regarding Ms. Romero's supervision arose, or was breached in regard to Plaintiff's memorandum.

Ms. Romero's contentious relationship with the long-term care manager, who was tasked with ensuring ESEM's compliance with regulations, is irrelevant to Plaintiff's claim insofar as that individual was not an employee of ESEM.  The Court does not take the long-term care manger's hearsay testimony that ESEM employees "feared for their jobs" in the event that ESEM failed to comply with regulations, into consideration.  *See* Fed. R. Civ. P. 56(C)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."); *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995) (stating that the substance of the evidence used in the context of summary judgment must be admissible).

In sum, Plaintiff's evidence does not support a reasonable inference that ESEM was negligent in its retention or supervision of Ms. Romero thereby subjecting him and other employees to an unreasonable risk of injury.   Nor does Plaintiff's evidence support a reasonable inference that ESEM failed to exercise ordinary care in that regard. Accordingly, Plaintiff's claim of negligent hiring and supervision fails as a matter of law.

### IX. Plaintiff's Claim of Intentional Interference With Business Relations

In Count 11 of his Complaint, Plaintiff claims that ESEM "intentionally and improperly induced or otherwise caused other potential employers to refuse to" hire him. [Doc. 21 ¶ 152] Defendant argues that there exists no evidence that it caused other employers not to hire Plaintiff.  [Doc. 96 p. 30]  In fact, Ms. Romero testified in a deposition that she had "never received a request [for a job reference] from anyone for" Plaintiff.  [Doc. 86-4, p. 10]  She further testified that when she has received requests for a grant writer, she has recommended that they call Plaintiff because "[h]e's an excellent grant writer."  [Id.]  Plaintiff concedes that, aside from his "suspicion" that Ms. Romero gave him negative references, he has no evidence to support his claim.  [Doc. 110 p. 31] In light of Ms. Romero's uncontroverted testimony, and Plaintiff's failure to provide evidence to support his suspicion, Plaintiff's claim of intentional interference with business relations fails as a matter of law.  *Conway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) ("In a response to a motion for summary judgment, a party cannot rest on . . . speculation, or on suspicion[,] and may not escape summary judgment in the mere hope that something will turn up at trial.").

## XII. Plaintiff's "Alternative Charge" of Prima Facie Tort

In Count 12 of his Complaint, Plaintiff makes non-specific claims that Defendant: "intentionally engaged in lawful conduct or omissions toward him"; intending to injure him, or knowing that it was reasonably certain that Plaintiff would be injured by these acts or omissions; these acts or omissions caused Plaintiff harm; and Plaintiff suffered damages as a result.  [Doc. 21 p. 24]  These allegations merely state the elements prima facie tort.  *Schuler v. McGraw-Hill Co., Inc*., 989 F.Supp. 1377, 1391 (D.N.M. 1997).  In

its *Motion for Summary Judgment*, Defendant argues that Plaintiff's claim constitutes an improper attempt to "evade stringent requirements of other established doctrines of law," and that Plaintiff's claim must, therefore, fail. *See id.* (stating that "[p]rima facie tort is intended to provide a remedy for intentionally committed acts that do not fit within the contours of accepted torts"; and it "should not be used to evade stringent requirements of other established doctrines of law"). Insofar as Plaintiff fails, both in his complaint and in his *Reply* to Plaintiff's *Motion,* to show that his prima facie tort claim is based on facts other than those used to support his remaining twelve claims, the Court concludes that, pursuant to *Schuler*, 989 F.Supp. at 1391, Plaintiff's prima facie tort claim fails as a matter of law.

### XIII. Plaintiff's Claim of Interference and Retaliation Under the FMLA

The FMLA prohibits an employer from retaliating against an employee for taking FMLA leave. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) It also prohibits an employer from interfering with the employee's right to take family medical leave. *Id.* Plaintiff claims that Defendant retaliated against him for taking FMLA leave and that it interfered with his right to do so. [Doc. 21 p. 25-26] The Court analyzes claims of interference and retaliation using different tests; accordingly, the Court addresses each of Plaintiff's claims in turn. *Id.* ("The distinction between [a FMLA interference theory and a FMLA retaliation theory] is important because the elements and burdens of proof that apply [to the respective claims] differ[.]").

### A.  Plaintiff's FMLA Retaliation Claim

"Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas*" in which "[t]he plaintiff bears the initial burden of establishing a prima facie case of retaliation." *Metzler*, 464 F.3d at 1171. "If the plaintiff [satisfies his initial burden], then the defendant must offer a legitimate non-retaliatory reason for the employment action." *Id.* "The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." *Id.*

For the purpose of considering whether Plaintiff's FMLA retaliation claim can survive Defendant's *Motion for Summary Judgment*, the Court assumes, without deciding, that Plaintiff has satisfied his prima facie burden of establishing FMLA retaliation. Further, for the reasons discussed in regard to Plaintiff's age discrimination claim, the Court concludes that Defendant satisfied its burden of showing that legitimate non-discriminatory reasons underlay its termination of Plaintiff's employment. Thus, the only remaining issue is whether Plaintiff can demonstrate that a triable issue of fact exists as to whether Defendant's reasons for terminating him were a pretext for FMLA retaliation.

Relying on *Metzler*, 464 F.3d at 1171, Plaintiff argues that because his employment was terminated "very close in time" to having taken FMLA leave, it is reasonable to infer that Defendant acted with a retaliatory motive. [Doc. 110 p. 23] Evidence of temporal proximity between the protected activity of taking FMLA leave and an employee's termination is "sufficient to justify an inference of retaliatory motive" in determining whether the plaintiff has made a prima facie showing of retaliation. *Id.* at 1171. Without more, however, temporal proximity between those two events is

insufficient to demonstrate pretext.  *Id.* at 1172 ("[T]his court has refused to allow even very close proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext." (alteration omitted)); *Proctor v. United Parcel Serv.*, 502 F. 3d 1200, 1213 (10th Cir. 2007) ("Although we may consider evidence of temporal proximity- typically used to establish a prima facie case-in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext[.]); *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1180 (10th Cir. 1999) (holding that temporal proximity between a protected activity and an adverse employment action that is sufficient to survive summary judgment is insufficient, standing alone, to demonstrate pretext).  Aside from his temporal-proximity argument, Plaintiff neither argues, nor points to any specific evidence to support his claim, that Defendant's stated reasons for terminating his employment were pretextual.

For the foregoing reasons, the Court concludes that summary judgment in favor of Defendant is warranted as to Plaintiff's FMLA retaliation claim.  This conclusion applies as well to Plaintiff's claim of FMLA retaliation as raised in Count 7 of Plaintiff's Complaint.[4]

### B.  Plaintiff's FMLA Interference Claim

"The FMLA guarantees the substantive right of up to twelve weeks of unpaid leave for eligible employees of covered employers for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave."

---

[4] The Court need not, and does not, decide whether the NMHRA actually permits such a cause of action.

*Metzler*, 464 F.3d at 1180.  "Under the FMLA, an employer may not interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA."  *Id.*  However, an employee who requests, or is taking, FMLA leave "has no greater rights than an employee who remains at work."  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).  Thus, "[a]n employer can defend [a FMLA interference] claim by showing that the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."  *DeFritas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159-60 (10th Cir. 2009).

To prevail on a FMLA interference claim, the plaintiff must demonstrate that: (1) he was entitled to FMLA leave; (2) his employer interfered with his right to take FMLA leave; and (3) the employer's at-issue action was related to the exercise or attempted exercise of the plaintiff's right to take FMLA leave.  *Id.*  It is undisputed that Plaintiff was entitled to twelve weeks FMLA leave.  [Doc. 96 p.14-15]  Thus, the Court turns to the parties' arguments regarding the remaining two elements.

Plaintiff claims that the termination of his employment interfered with his right to take FMLA leave because ESEM decided to eliminate his position and then terminated his employment *while* he was on leave.  [Doc. 110 p. 21]  It is undisputed that Ms. Romero decided to eliminate Plaintiff's position in mid-May, 2012, while Plaintiff was on leave.  [Doc. 96-14 ¶ 19]  It is also undisputed that Plaintiff's employment was terminated by letter on June 25, 2012.  [Doc. 96-7 p. 1]  However, whether Plaintiff's leave ended before June 25, 2012 is a matter that is disputed by the parties.

32

Plaintiff argues that his FMLA leave began on March 30, 2012 and ended on June 29, 2012.  [Doc. 110 p. 20]  In support of this contention, Plaintiff points to: (1) ESEM's FMLA "spreadsheet," apparently created by ESEM's then-HR manager, which indicates that Plaintiff's FMLA leave began on March 30, 2012 and ended on June 29, 2012; (2) a copy of an e-mail sent by Plaintiff to Ms. Romero and to an HR employee stating, in relevant part, that Plaintiff had spoken with the HR manager "last week and she said that my last day of FML is June 29"; and (3) deposition testimony of the same HR employee to whom Plaintiff's email was addressed indicating that she had previously testified (in a different lawsuit against Defendant) that three months and twelve weeks are "pretty much the same" in terms of calculating FMLA leave.  [Doc. 110 p. 4-6, 20; Doc. 110-1]

Defendant argues that Plaintiff's FMLA leave began on March 30, 2012 and ended twelve weeks (not three months) later, on June 22, 2012.  In support of this claim, Defendant argues that, regardless of Plaintiff's belief that his FMLA leave ended on June 29, 2012 he was entitled only to twelve weeks of leave, as a matter of law; and his twelve weeks ended on June 22, 2012.  [Doc. 117 p. 19]  Defendant also points to deposition testimony of ESEM's then-HR manager, who stated that, in regard to FMLA leave, she "would always specify . . . it's 12 weeks, which is not three months.  It's 84 days."  [Doc. 96-2 p 4]

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that, at the time that Plaintiff's employment was terminated, Plaintiff and the ESEM employees involved in the administration of Plaintiff's FMLA leave, believed that Plaintiff's FMLA leave ended on June 29, 2012.  While ESEM's HR manager testified

that she always told employees that FMLA leave was twelve weeks, not three months, the FMLA chart that she created shows that, when she input Plaintiff's leave on the chart, she believed that Plaintiff's FMLA leave ended on June 29, 2012.  Plaintiff's e-mail, in which he references his conversation with the HR manager comports with the chart, and likewise supports an inference that the HR manager understood that Plaintiff's FMLA leave ended on June 29, 2012.  A deposition of an HR employee also shows that, prior to the litigation in this matter, she testified in regard to FMLA leave, that twelve weeks and three months were "pretty much the same."  Although the HR employee's testimony in the present lawsuit differed from her former testimony, it is reasonable to infer that she formerly understood FMLA leave to be three months.  Furthermore, to the extent that she, or Ms. Romero, believed that Plaintiff's leave ended on June 22 instead of June 29, neither of them sought to correct Plaintiff's misunderstanding by responding to his e-mail.

That a reasonable jury could conclude that Plaintiff, Ms. Romero, and ESEM's HR personnel shared a mistaken belief that Plaintiff's FMLA leave ended on June 29 when, in fact, it ended on June 22 is significant for two reasons.  First, assuming that Ms. Romero believed that she was terminating Plaintiff's employment during his FMLA leave, this fact has "significant probative force" in establishing the third element of Plaintiff's FMLA interference claim.  *DeFritas*, 577 F.3d at 1161 (stating that "[w]henever termination occurs while the employee is on leave, that timing has significant probative force" in establishing that the employee's action was related to the employee's exercise of his right to FMLA leave).  Secondly, it renders Defendant's

34

technical argument that, as a matter of law, Plaintiff only had twelve weeks, not three months, of FMLA leave disreputable.  In sum, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that all involved understood that Plaintiff was on FMLA leave when he was terminated.  From this, a reasonable jury could find that Defendant interfered with his right to take FMLA leave by terminating his employment while Plaintiff was on FMLA leave.

The inquiry does not end there, however.  As it has in regard to Plaintiff's other claims, Defendant argues that it terminated Plaintiff's employment for legitimate reasons; and that, regardless of whether he had taken FMLA leave, Defendant would have terminated Plaintiff's employment for those reasons.  *Smith*, 298 F.3d at 961 ("[D]ismissal insufficiently related to FMLA leave will not support recovery under an interference theory").

To reiterate the evidence pertaining to Defendant's decision to terminate Plaintiff's employment, Defendant's undisputed material facts show that in response to its financial difficulty, it was downsizing and restructuring.  Several positions, not only Defendant's position, were eliminated.  Mr. Johnson, the CEO of ESEM had expressed increasing dissatisfaction with Plaintiff in a series of letters dating back to 2009.  The letters reflected Mr. Johnson's various concerns that Plaintiff's actions were placing ESEM at risk of lawsuits and affecting the "overall health" of aspects of ESEM's operation.  [Doc. 96-1 p. 1, 5-6]  The letters also reflect that Mr. Johnson was continuously dissatisfied with Plaintiff's performance of his job duties, and that he had warned Plaintiff, and others, that if certain improvements were not made, ESEM would

"need to change our leadership." [Doc. 96-1 p. 1, 4, 10] In one of the letters Mr. Jonson also informed Plaintiff that he could not "continue to work with [Plaintiff's] attitude" which, was an on-going problem that had "spilled over into the bigger spectrum of [Plaintiff's] employment." [Doc. 96-1 p. 7] Mr. Johnson continued, "It doesn't sound like you want to be here, so you need to tell me how you wish to proceed, as this behavior is impeding upon your ability to be successful." [Id.]

The *McDonnell Douglas* analyses does not apply to Plaintiff's FMLA interference claim; therefore Plaintiff does not have the burden of demonstrating that Plaintiff's stated reasons for terminating him were pretextual. *See Metzler*, 464 F.3d at 1180 ("[T]he *McDonnell Douglas* burden-shifting analysis does *not* apply to [FMLA] interference claims [.]"). However, Defendant had legitimate reasons for terminating Plaintiff's employment, and under the circumstances of this case, even assuming that Defendant believed that it was terminating Plaintiff's leave four days before his FMLA leave was complete, this fact, alone, does not tend to show that Defendant's decision was caused by Plaintiff's FMLA leave. *See Smith*, 298 F.3d 955 ("[A]n employee who requests FMLA leave" has no "greater protection against his . . . employment being terminated for reasons not related to his . . . FMLA request than he . . . did before submitting the request."). Accordingly, the Court grants Defendant's motion for summary judgment as to Count 13 of Plaintiff's Complaint.

**CONCLUSION**

**IT IS THEREFORE HEREBY ORDERED** that *Defendant Easter Seals El Mirador's Motion for Summary Judgment on Plaintiff's Claims for Violations of Title VII, ADEA, ADA, FMLA, and the New Mexico Human Rights Act* is **GRANTED**.

**IT IS SO ORDERED** this 31st day of March, 2016 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge